# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DENNIS MURPHY,**

                              **Plaintiff,**

**-vs-**                                                      **Case No.  6:06-cv-82-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Dennis Murphy, seeking review of the final decision of the Commissioner of Social Security

denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration (SSA).

Doc. Nos. 9, 10.  Pursuant to the consent of the parties, this matter has been referred to me for

disposition under 28 U.S.C. § 636(c).  Doc. Nos. 12, 13.

## I.    PROCEDURAL  HISTORY.

In November 2001, Murphy applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the

Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381,

*et seq*., (sometimes collectively referred to herein as the Act).  R. 211-14.[1]  Murphy alleged that he

_____

[1]   The record does not contain Murphy's application for benefits under OASDI.  Other records discuss this application, and the administrative law judge made specific findings about Murphy's entitlement to OASDI.  Therefore, it appears that the application was simply omitted from the record.

became disabled on April 30, 1997.  *Id*.  Murphy's applications were denied initially and on

reconsideration.  R. 41-44, 49-50, 53-55, 209-10, 215-218.

Murphy requested a hearing before an administrative law judge (ALJ).  R. 48.  An ALJ held

a hearing on May 24, 2004. Murphy, represented by an attorney, testified at the hearing.  Catherine

Grimm, Murphy's girlfriend, also testified.  R. 220-42.

After considering the testimony and the medical evidence presented, the ALJ determined

that Murphy was insured under OASDI through June 30, 2002.  R. 33. The ALJ found that while

Murphy had engaged in some work after his alleged onset date of disability, it did not rise to the

level of substantial gainful activity.  *Id*.

The ALJ concluded that the medical evidence showed that Murphy had a fractured femur

and a history of depression, which were severe impairments.  However, these impairments, either

singly or in combination, did not meet or equal any of the impairments listed in the applicable social

security regulations (the Listings).[2] R. 28.

The ALJ found that Murphy had the residual functional capacity (RFC) to perform light

work[3] on a sustained basis.  Specifically, the ALJ determined that Murphy could lift and carry

twenty pounds occasionally and ten pounds frequently; could push and pull the same weight; could

---

[2]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[3]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567,  416.967.

"sit, stand, and/or walk six hours out of an eight-hour workday with normal breaks"; and could occasionally climb, balance, stoop, kneel, crouch, and crawl with the right leg, but never with the left leg. R. 33. Murphy also needed to avoid concentrated exposure to hazardous machinery and heights, and the like. *Id*. Murphy's mental capacities permitted him to understand, remember, and carry out simple instructions and make judgments commensurate with the functions of unskilled work, such as making simple work-related decisions. *Id*. He could also respond appropriately to supervision, co-workers and usual work situations and deal with changes in a routine work setting. R. 33-34.

The ALJ determined that Murphy could perform his past relevant work as a cook or sandwich maker, either as performed or as those jobs are performed in the national economy. R. 32-33 (citing the *Dictionary of Occupational Titles* (DOT)). Therefore, the ALJ concluded that Murphy was not disabled. R. 34.

In reaching this conclusion, the ALJ found that Murphy's testimony about the limitations arising from his impairments was not totally credible. R. 31. The ALJ observed that there was "very limited objective support for [Murphy's] testimony." *Id*. While there was evidence that Murphy sustained the injury to his left femur in an automobile accident in 1997 and underwent surgery, medical records, including x-rays, indicated at that time that the fracture had healed. *Id*. The ALJ also observed that no doctor had instructed Murphy to avoid working, and that while he had a limp, Murphy was able to drive himself to doctor's appointments and ambulate without assistance from the parking lot to the office. *Id*. "The record indicates that [Murphy] performs normal daily activities and travels whenever he pleases." R. 32. The ALJ also observed that

Murphy could perform routine ambulatory activities "such as taking public transportation, banking, and shopping."  R. 29.  Additionally, Murphy could perform basic activities such as preparing simple meals, sorting and handling files, bathing, dressing, and feeding himself.  *Id.*

As for Murphy's mental impairments, the ALJ concluded that there was no evidence that Murphy would be restricted in activities of daily living, social functioning, or maintaining concentration, persistence or pace.  There was also no evidence that Murphy had repeated and extended episodes of decompensation.  *Id.*

Murphy requested review of the ALJ's decision. R. 7.  On November 16, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 4-6. Murphy timely sought review of this decision by this Court.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Murphy's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

A.     *Evidence from Murphy.*

Murphy was born January 31, 1978.  R. 222.  He is 5'11" tall and weighed 450 pounds at the time of the hearing.  R. 224.  He had gained approximately 100 pounds over the preceding two years.  *Id.*[4]  He attributed his weight gain to his inability to do anything.  *Id.*

---

[4]  In November 2001, he reported his weight as 370 pounds.  R. 97.

-4-

Murphy completed tenth grade, but he did not complete a GED or vocational training.  R. 224-25.  He previously had been incarcerated for a felony.  R. 78, 236.

Murphy had worked as a parking lot cleaner.  R. 225.  In that position, he used a leaf blower to clear trash from parking lots, as well as cleaned trash cans.  R. 226.   He lifted up to twenty-five pounds, though some garbage cans weighed as much as 100 pounds, and he was required to stoop, crouch and crawl.  R. 77, 229.  Murphy stopped working at the parking lot cleaning company after two or three months because of pain in his leg.  R. 98, 226.  In particular, his leg would be swollen after work, and he would need to sleep before the swelling would go down.  R. 226.

Murphy had also previously worked at fast-food restaurants as a cook and dishwasher.  R. 228.  In these positions, Murphy prepared food and assisted with general cleaning.  R. 74-76, 99, 228.  He occasionally lifted over 100 pounds and frequently lifted up to twenty-five pounds.  R. 74-76, 99.  Some of these jobs also required Murphy to perform postural activities.  *Id.*

The ALJ did not inquire about the mental abilities attendant to Murphy's past relevant work, and the record does not contain descriptions of the mental abilities necessary to do this work, as Murphy performed it.

Murphy was involved in an automobile accident in 1997.  R.  227.  He injured his left femur and received emergency treatment.  *Id.*  Seven or eight months later, Murphy underwent

subsequent surgery, in which a rod was inserted into his left leg.  *Id*.  Initial x-rays did not show

anything wrong, but a doctor had recently diagnosed a nonunion fracture.[5]  R. 230.

   After the accident, Murphy had consistent leg pain with cramping.  R. 227.  He also

frequently lost his balance, and used a cane to walk.  R. 229-30.  Elevating his leg and taking

aspirin helped alleviate the pain.  R. 229.  He had been put on a waiting list for surgery.  R. 230.

He also had back and lower extremity joint pain, all of which was exacerbated by his weight.   R.

229.

   In a typical day, Murphy got up around 9:00 or 10:00 A.M.  He returned to bed and

watched television most of the day.  R.  232.  His only hobby was caring for fish in his fish tank. *Id*.

He did not visit with friends, and did not consider himself a social person.  *Id*.  He frequently took

naps lasting more than an hour.  R. 234.  Murphy could not cook for himself, walk to the

bathroom, shop, or do his own laundry.   His girlfriend or paid workers attended to these chores.

R. 69, 87, 233.

   Murphy estimated that he could stand for up to twenty minutes, but that he would

experience pain for the entire time.  R. 233.  He estimated that he could lift forty or fifty pounds,

but that he could not carry the weight.  *Id*.  If he were standing, he estimated he could only lift ten

pounds.  *Id*.  He estimated that he could sit for twenty or thirty minutes before his legs would begin

hurting and cramping.  R. 234.  When that happened, he would lie down, put up his feet, take

---

[5]  A nonunion fracture refers to a fracture that does not properly heal.  STEDMAN'S MEDICAL
DICTIONARY 1218 (26th ed. 1996) (hereinafter STEDMAN'S).

aspirin, and massage the cramp.  R. 234.  He estimated that he could only walk twenty to fifty feet.
R. 235.

Murphy used to drink heavily on a daily basis to deal with the pain in his leg.  R. 237.  By
the time of his hearing, he would engage in binge drinking once every three weeks or so, although
occasionally he could abstain for three months.  *Id*.

Catherine Grimm, Murphy's girlfriend, testified that she supported Murphy.  R. 239.
Grimm did all of the household chores, including getting Murphy food and drinks.  R. 240.  She
estimated that Murphy spent 90% of the day in bed or on the couch.  *Id*.  Grimm had observed
Murphy's weight gain, and believed he had gained 200 pounds over a four-year period.  *Id*.  She
also observed that Murphy drank to deal with depression and physical pain.  R. 241.

B.      *Medical Records.*

1.      Records Regarding Physical Impairments.

Medical records from the Volusia County Department of Corrections from August through
December 1999, reflect that Murphy had undergone surgery for his left femur, including pin
placement, and that Murphy had high blood pressure.  R. 128-32.  Murphy complained of left leg
pain, and treating professionals observed that he walked slowly with a limp.  R. 129.  He was
treated with pain medication, and his medical plan called for a low bunk and no work.  R. 128-32.
Notes indicate that he was authorized to use a cane if one was available.  R. 129.

In April 2000, Murphy developed chest pain while being taken to jail, and the police
brought him to the Halifax Medical Center emergency room for evaluation.  R. 118-19.  Murphy
demanded medication, but soon fell asleep.  R. 119.

In June 2000, Murphy was seen at the Halifax Medical Center emergency room as the result of an alleged assault. R. 114. He complained of jaw, neck, and back pain. R. 113-14. The attending physician observed contusions and abrasions of the neck. R. 115. Murphy was given a soft collar, Lortab,[6] and released. R. 115.

Medical records from the Volusia County Department of Corrections from October through December 2000, indicate that Murphy had high blood pressure, had had surgery of the left femur, and had lost 100 pounds over nine months due to dieting. R. 123-24; 133-35. In December, he complained of left leg pain, and the treating professional observed that Murphy walked slowly and with a limping gait. R. 133.

In September 2001, Murphy was seen for a vocational evaluation. R. 136-40. Murphy complained of pain in his leg when walking or standing, and reported that he had difficulty keeping his balance. R. 136. Andrew Roth, the evaluator, observed that "[a] nonunion of the bone is suspected." *Id*. "His left femur is permanently angled sharply to the left, making it difficult for him to kneel, crawl, stoop, and walk on uneven surfaces. [Murphy] cannot run or climb." R. 137.

Roth administered a number of tests. Roth concluded that Murphy had excellent reading comprehension skills and functional math skills. However, he had difficulty with concentration. R. 140.

---

[6] Lortab is the brand name for a combination of acetaminophen, a nonsteroidal anti-inflammatory drug, and hydrocodone, and is prescribed in the treatment of moderate to moderately severe pain. Medline Plus, *Acetaminophen and Hydrocodone*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html (last visited Mar. 7, 2007).

Roth also administered a physical capacity and mobility screening evaluation.  He concluded that Murphy could balance with difficulty with his right leg and not at all with his left leg.  He could not kneel, crawl or climb, and he could only squat, stoop and crouch with difficulty.  R. 139.  Roth observed that "[f]rom a physical standpoint Mr. Murphy is most comfortable in a seated position.  He does need to extend his left leg to feel more comfortable. [He] is precluded from jobs that require him to walk or stand for prolonged periods of time."  R. 139-40.  Roth also noted that Murphy's criminal record would preclude him from certain jobs.  R. 140.

Roth concluded that Murphy could likely perform the position of Collector, DOT 341.367-010, Dispatcher, DOT 249-167-014, and Assembler, DOT 726.684-070.  *Id*.

In June 2002, Murphy was seen by Jack E. Pulwers, M.D., at the request of the SSA.  R. 155-59.  Dr. Pulwers observed that Murphy fractured his femur in 1997, which was repaired with a rod and pinning, and that the pins were subsequently removed.  R. 155.  Dr. Pulwers noted that Murphy walked with an abnormal gait.  *Id*.  Murphy reported that he could not walk over uneven surfaces because his legs would give way, and that he had fallen several times.  He also had pain in his posterior muscles and everywhere in the upper portion of the leg.  He had pain in his kneecap.  He could only sit twenty minutes, and stand only twenty minutes.  He could walk fifty feet, in from the parking lot to the doctor's office, without any difficulty even though his gait was abnormal.  *Id*.

Upon examination, Dr. Pulwers observed that Murphy weighed 369.5 pounds.  *Id*.  He had normal range of motion in the upper extremities, hypermobility of the left leg, and an "extreme limp

-9-

with his left leg outward rotated." R. 156. Straight-leg raising[7] and Romberg sign[8] tests were

negative, but Murphy was "unable to walk a tandem-walk." R. 156-57. An x-ray of the left femur

showed the rod and one screw. Dr. Pulwers opined that the femoral fracture was well healed. R.

157.

In September 2002, Murphy was seen by Reginald Q. Bowden, M.D. R. 200-01. Murphy

reported pain, numbness and edema in the left leg. R. 200. Murphy walked with his left foot

externally rotated, and could twist his left leg almost to 180 degrees. *Id*. Dr. Bowden also

observed an eight-year history of hypertension. *Id*. The assessment was left leg pain, chest pain,

and hypertension, among other things. R. 201. In subsequent visits, Murphy continually

complained of left leg pain. R. 190.

In October 2002, Roy J. Siragusa, M.D., a radiologist, read x-rays of Murphy's left leg and

knee. He found no acute fracture or dislocation. R. 198-99. However, a tomogram[9] of the left

---

[7] "'The simple straight-leg raising test is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

[8] "[W]ith feet approximated, the patient stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated, and the sign is positive." STEDMAN'S at 1619. Proprioceptive control refers to the ability to sense "the movements and position of the body and especially its limbs . . . ." *Id*. at 1439.

[9] A tomogram is a radiograph (image) created by moving an x-ray source in one direction as the x-ray film is moved in the opposite direction. The result is that the focal plane is focused, and the other planes are blurred. STEDMAN'S at 1819.

femur taken in March 2003 indicated some evidence of a nonunion of the fracture and significant callus formation.  R. 187.  Another examination revealed some looseness around the rod.  R. 189. In April 2003, Murphy was seen by someone whose name is illegible.  R. 186.  The impression was left femoral nonunion.  *Id*.

2. Records Regarding Mental Impairments.

In July 2002, Murphy was seen by Malcolm G. Graham, Ph.D., a clinical psychologist, for a consultative examination at the request of the SSA.  R. 168-71.  Dr. Graham noted that Murphy attempted suicide in 1996, at which time he was hospitalized for ten days.  Thereafter he had not seen a mental health professional.  R. 169.

Murphy reported drinking about a half-gallon of whiskey everyday from 1997 until 2001, which resulted in blackouts and delirium tremens, but no seizures.  He still drank the same amount about once a month.  Murphy had never been treated for an alcohol problem.  *Id.*

Dr. Graham observed no indication of depressed or anxious mood, affect was appropriate, there were no defects in quality of thinking, and concentration was normal.  *Id.*  Murphy was oriented to time, place, and person, had normal memory, and there was no evidence of hallucinations or perceptual disturbances.  R. 170.  The diagnoses included alcohol dependence, not in remission, and anti-social personality disorder, and the prognosis was guarded to poor. Murphy's current and former Global Assessment of Functioning Scores (GAF) ranged between sixty and seventy.[10]  *Id.*

---

[10]  The GAF scale is used to report an individual's overall level of functioning. A rating of 51-60 reflects:

C.    *Reviewing Professionals.*

    1.    <u>Records Regarding Physical Impairments</u>.

In June 2002, Eric C. Puestow, M.D., prepared a Physical Residual Functional Capacity Assessment based on a review of Murphy's records.  R. 160-67.  Dr. Puestow concluded that Murphy could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand or walk for two hours and sit for about six hours in an eight-hour workday.  R. 161.  Murphy could not push or pull at all using the left leg.  *Id.* Dr. Puestow indicated Murphy would have occasional limitations in climbing, balancing, stooping, kneeling with the right leg, and crouching, and that Murphy could never climb ladders, kneel with his left leg, crouch, or crawl.  R. 162.  Murphy should avoid concentrated exposure to hazards such as machinery or heights.  R. 164.  These restrictions were based on findings that pain reduced Murphy's ability to stand or walk, that his symptoms were exacerbated by obesity, and that the femur fracture appeared to be well-healed.  R. 165.

---

    Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or coworkers).

A rating of 61 to 70 reflects:

    Some mild symptoms (eg, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (eg occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998).

2.    Records Regarding Mental Impairments.

In January 2002, Steven L. Wise, Psy.D., a clinical psychologist, completed a Psychiatric Review Technique form based on a review of the records.  He concluded that there was insufficient evidence to make a determination.  R. 141-54.

In July 2002, Wendy Silver Psy.D., a clinical psychologist, completed a Psychiatric Review Technique form.  R. 172-85.  She concluded that Murphy had an anti-social personality disorder and substance addiction disorder, but that these were not severe.  R. 172, 179.  She concluded that Murphy would experience mild difficulties in maintaining social functioning and maintaining concentration, persistence, and pace, and no other limitations.  R. 182.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

-13-

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210

(11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847

F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §

405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more

than create a suspicion of the existence of the fact to be established. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v.*

*Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well

as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the

court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210.  The court

may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption

attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating

claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if

the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient

reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human*

*Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146

(11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.    ANALYSIS.

Murphy asserts various grounds supporting reversal.  He contends that the ALJ did not fully develop the mental demands of his past relevant work and erred in failing to obtain vocational expert (VE) testimony at step four of the sequential evaluation process.  He also contends that the ALJ did not properly consider the limitations arising from pain and other subjective symptoms and improperly assessed his credibility regarding those limitations.  In an interrelated issue, he argues that the ALJ failed to consider all of his limitations and that the decision that he could perform sustained work activity is not supported by substantial evidence.  These are the only issues I will consider.[11]

> A.    *Whether the ALJ Erred in Concluding that Murphy Could Return to His Past Relevant Work.*

Murphy contends that the ALJ erred at step four of the sequential evaluation process by failing to develop the mental demands of his past relevant work. An ALJ must develop a full and fair record concerning the physical and mental requirements of previous work.  *See, e.g.*, *Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986); *see also* Soc. Sec. Rul. 82-62, 1982 WL 31386 ("In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact: . . . 2.  A finding of

---

[11]  The parties were advised that issues not specifically raised would be considered waived.  Doc. No. 11 at 2.

fact as to the physical and mental demands of the past job or occupation.").  Failure to develop all of the requirements of past relevant work at step four requires remand for further proceedings.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545-46 (11th Cir. 1988).

Here, the ALJ determined that Murphy could perform his past relevant work of cook and sandwich maker as he performed them and as those jobs are performed in the national economy.  R. 33.  The ALJ described the cook job as semi-skilled, light work.  *Id*. (citing DOT 313.374-014).  The ALJ described the sandwich maker job as unskilled, light work.  *Id*. (citing DOT 311.477-014).

Unskilled work under the SSA regulations is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . ."  20 C.F.R. §§ 404.1568(a), 416.968(a).  Semi-skilled work is defined as "work which needs some skills but does not require doing the more complex work duties."  *Id.* §§ 404.1568(b), 416.968(b).

The ALJ did not make an explicit finding about the mental demands of Murphy's past relevant work.  There is no information in the record about the mental demands of Murphy's past relevant work as he performed it.  With respect to how these jobs are performed in the national economy, the DOT categorizes jobs requiring a specific vocational preparation (SVP) level of 1 or 2 as unskilled work.  *Williams v. Barnhart*, 424 F. Supp. 2d 796, 803 n.19 (E.D. Pa. 2006)(citing Soc. Sec. Rul. 00-4p, 65 FR 75759, 2000 WL 1765299, at *75760).  This part of the definition addresses the period of time necessary to learn the job.  Another element of each DOT description, the reasoning requirement, addresses the need to exercise judgment and the complexity of the tasks to be performed.  Under the DOT, a reasoning level 1 requires the ability to "[a]pply commensense understanding to carry out simple one- or two-step instructions, [and deal] with problems involving

-17-

a few concrete variables in or from standardized situations." Westlaw DICOT Appendix C -

Components of the Definition Trailer.  Reasoning level 1 appears most closely to correlate to the

ALJ's finding that Murphy had the ability to understand and carry out simple instructions and make

simple work-related decisions.

The ALJ identified Murphy's past work as a cook as equating to DOT 313.274-014.  This

provision of the DOT requires an SVP 3 and a reasoning level 3.  A reasoning level of 3 requires

the ability "[t]o apply commonsense understanding to carry out instructions furnished in written,

oral, or diagrammatic form [and deal] with problems involving several concrete variables in or from

standardized situations."  *Id.*

The ALJ identified the job of sandwich maker as one described in DOT 311.477.014.  This

provision of the DOT requires an SVP 2 and a reasoning level 2.  A reasoning level of 2 requires

the ability "[t]o apply commensense understanding to carry out *detailed* but uninvolved written and

oral instructions [and deal] with problems involving a few concrete variables in or from

standardized situations."  *Id.* (emphasis added).

The reasoning level for both of these jobs appears to exceed Murphy's RFC, which the ALJ

found was limited to the ability to understand only simple instructions and make simple work-

related decisions.  The ALJ did not cite to the reasoning level requirements of these jobs or explain

why he concluded that Murphy could perform this work despite his finding that Murphy's mental

capacity was limited to the ability to understand and carry out simple instructions and make simple

decisions.  Thus, there is not a sufficient basis in the record to support the ALJ's conclusion that

Murphy had the mental capacity to return to his past relevant work, either as he performed it or as performed in the national economy, with the mental RFC as determined by the ALJ.

Murphy also asserts that the ALJ should have called upon the services of a VE to determine whether he could perform his past work in light of his nonexertional limitations.  The Commissioner correctly argues that VE testimony is not required if the ALJ determines at step four that a claimant is capable of performing his past relevant work.  *Lucas v. Sullivan*, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990).   However, use of a VE at step four is not precluded in this circuit.  *See Hennes v. Comm'r of Soc. Sec.*, 130 Fed. Appx. 343, 346  (11th Cir. 2005)(finding that the ALJ did not err in considering the testimony of a VE in determining whether the claimant could perform her past relevant work). When, as here, the ALJ's decision and the evidence in the record is insufficient to support a finding that a claimant can perform the mental as well as physical demands of past relevant work, the assistance of a VE would be appropriate, although not required.

B.     *Consideration of Murphy's Testimony and Pain.*

Murphy also contends that the ALJ did not properly consider his complaints of pain and, consequently, erred in concluding that his testimony about the functional limitations arising from pain and other subjective symptoms was not entirely credible.

In this circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. This standard "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to

the alleged pain.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)). If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d at 1562.

In this case, the ALJ found "very limited objective support" for Murphy's testimony that the pain in his left leg kept him from working, that he had constant pain, and that he fell on a regular basis. R. 31. In support of this conclusion, the ALJ noted that Murphy had never required an artificial aid in ambulation. He also relied upon Dr. Pulwers' report (Exhibit 5F), which reflected that a straight-leg raising test was negative, that while Murphy walked with a limp, he was able to drive himself to doctor's appointments and ambulate without assistance from the parking lot to the office, and that Murphy could perform routine ambulatory activities and basic activities of daily living. The ALJ also noted that Dr. Pulwers' and Dr. Siragusa's reports (Exhibits 5F and 9F at 13) showed that Murphy's left leg fracture had healed.

Murphy correctly challenges the ALJ's findings in many respects. While initial x-rays reflected that the left leg fracture had healed, subsequent radiological studies submitted to the ALJ revealed a nonunion fracture. While the tomographic testing that revealed the likely nonunion fracture was not taken until after Murphy's last insured date under OASDI, it was directly relevant to Murphy's SSI claim and circumstantially relevant to explain the leg pain Murphy complained of throughout the OASDI insured period. Yet, the ALJ inexplicably did not cite to the later radiological studies or offer any explanation of his lack of reliance on them. The record also

-20-

reflects that Murphy used "an artificial aid in ambulation," specifically a cane, and that the cane had been authorized by medical personnel.  Remand is appropriate to permit a more detailed review of the record to assess Murphy's RFC in light of all of the evidence.

    C.    *Consideration of Murphy's Impairments In Combination.*

Finally, Murphy contends that the ALJ failed to consider all of his impairments in combination in reaching the conclusion that he could perform sustained work activity.  Specifically, Murphy contends that the ALJ failed to consider the limitations arising from pain, his inability to balance resulting in falling, and the need to elevate his leg during the day.

Because remand is required on other grounds, I will not discuss this assignment of error in detail.  On remand, the Commissioner must consider all of Murphy's impairments, including the impact his obesity would likely have on his ability to engage in any weight-bearing activities.

**VI.**    **CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 7, 2007.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-21-